UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

31FO, LLC,

                                        Plaintiff,

                    -against-                                    22-cv-3303(GRB)(ARL)

INCORPORATED VILLAGE OF LLOYD HARBOR, JEAN M.
THATCHER, individually and as Village Mayor, THOMAS
KRUMPTER, individually and as Village Police Chief, JAMES
SINO, individually and as Village Building Inspector, JILL
CERVINI, individually and as Village Clerk, TED SHAPSES,
individually and as President of the Fort Hill Beach and Road
Association, and FORT HILL BEACH AND ROAD
ASSOCIATION, INC.,

                                        Defendants.

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO ROAD ASSOCIATION DEFENDANTS' RULE 12 MOTION TO DISMISS

Dated Served: January 3, 2023

ROSENBERG CALICA & BIRNEY LLP
By:     Edward M. Ross
          Judah Serfaty
*Attorneys for Plaintiff*
100 Garden City Plaza, Suite 408
Garden City, New York 11530
(516) 747-7400

**<u>TABLE OF CONTENTS</u>**

Preliminary Statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

POINT I – DEFENDANTS IMPROPERLY RELY ON EXTRINSIC EVIDENCE.. . . . . . . . . . 3

POINT II – PLAINTIFFS STATE VIABLE CLAIMS UNDER §§1981, 1983 & 1985.. . . . . . . 4

      A.     Discrimination, Retaliation, and Conspiracy. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      B.     Damages.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

      C.     Standing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

POINT III – PLAINTIFF STATES VIABLE STATE CONSTITUTION CLAIMS.. . . . . . . . . 18

POINT IV – PLAINTIFF'S EIGHTH AND NINTH CLAIMS ARE AMPLY PLEADED.. . . . . 19

POINT V – PLAINTIFF STATES A VIABLE CLAIM UNDER N.Y. EXEC. L. §296. . . . . . . 20

POINT VI – PLAINTIFF STATES A VIABLE TORTIOUS INTERFERENCE CLAIM. . . . . . 20

## PRELIMINARY STATEMENT

Plaintiff respectfully submits this memorandum of law in opposition to the Rule 12(b)(6) motion filed by defendants Fort Hill Beach and Road Association, Inc. ("Road Association") and its President, Ted Shapses ("Shapses"; collectively with the Road Association, the "Road Association Defendants" or "Movants").

As detailed below, the Road Association Defendants' dismissal motion should be denied in its entirety because it (a) mischaracterizes virtually the entirety of Plaintiffs' Amended Complaint (hereinafter "AC"), (b) improperly resorts to extrinsic evidence, (c) erroneously challenges the legal sufficiency of Plaintiff's conspiracy claims, (d) raises purported standing arguments which are directly at odds with the Amended Complaint and controlling legal precedents, and (e) unavailingly seeks to challenge the legal sufficiency of Plaintiff's supplemental state law claims.

## STATEMENT OF FACTS

To avoid repetition, we respectfully refer the Court to Plaintiff's Statement of Facts in opposition the Village's dismissal motion. In addition, certain pleaded facts particular to the Road Association Defendants are addressed in the argument section below. However, some of Road Association Defendants' warped factual contentions are so contrary to Plaintiff's well-pleaded allegations—and even the extrinsic evidence upon which Movants rely[1]—that they merit special exposition.

Movants falsely contend the Amended Complaint and the 50-h examination testimony do not establish the Road Association Defendants played any part in the Village's amply alleged

---

[1] Plaintiff has objected and continues to object to the Defendants' reliance on extrinsic evidence in support of their dismissal motions, especially the 50-h Examination. Not knowing whether this Court will consider that extrinsic evidence, we point out that even if considered—which it should not be—the extrinsic evidence does not support Rule 12 dismissal.

invidious and non-invidious discrimination originating as a result of the Hindu Silent Retreat. However, Movants themselves spearheaded the discrimination and directly conspired with and caused the Village to discriminate against Plaintiff. See Point II below (citing, *inter alia*, AC ¶187 ("it was a member of the Road Association who complained about seeing **dark-skinned people in all white robes**" at the Property'"); 50-h Tr. at 102 (it was in fact Road Association President Shapses who made those racist and intolerant statements and reports to the Village), 99-102 (it was Shapses who took photographs of the silent retreat, brought them to the Village Police, and spearheaded the complaints); AC 129, 186-229 (Road Association Defendants actively participated in every aspect of the discrimination).

Movants falsely contend that Plaintiff 31FO's Deed somehow does not confer upon Plaintiff and its invitees the right to travel over the only road leading to Plaintiff's Property (Fort Hill Road) without needing permission of the Road Association. However, in fact, its Deed expressly states 31FO has an actual and deeded ownership "**right of ingress to and egress for all purposes from said premises in common with others over Fort Hill Drive**" (AC ¶194).

Movants pretend their refusal to allow film crews to travel over Fort Hill Road concerned something more than the film crews merely driving over the road a few minutes to reach Plaintiff's Fort Hill Property. To support this pretension, Movants invent a false counterfactual which is not supported by anything, and directly contravenes the Amended Complaint, *falsely* contending that "*Plaintiff seeks unfettered access to use and close off the road to the private [road] by virtue of its invitees (i.e., filming studios) to utilize and block off the road without reasonable limitations.*" Road Association Defendants' Mem. in Supp. of Mot. at 2.

Movants simply ignore that Plaintiff repeatedly sought filming on Plaintiff's large and secluded Property, there was no request to "close off" or "block off the road without reasonable limitations," and no request for "unfettered access" whatsoever. See AC ¶¶186-229.

<u>ARGUMENT</u>

**POINT I – DEFENDANTS IMPROPERLY RELY ON EXTRINSIC EVIDENCE**

Plaintiff objects to Defendants' inclusion of lengthy and improper extrinsic evidence and testimony which is not permitted upon a Rule 12 motion, specifically the Village's Exhibit A (transcript of 50-h Examination), and Movants' Exhibit B (same), Exhibit C (Movants' attorney's letter, not referenced in the AC), and Exhibit E (alleged easement, not referenced in the AC). Most flagrant and improper is Defendants' pervasive reliance in nearly every Point on a 268-page transcript from a 50-h examination of 31FO's principal, as if this were a summary judgment motion or trial. *"[T]he 'weight of authority in the Second Circuit' excludes 50-h hearing testimony from consideration on a motion to dismiss.*" McDonald v. Hempstead U.F.S.D., 2019 WL 2716179, *4 (E.D.N.Y. 2019).

Movants erroneously posit the limited exception should apply where a plaintiff relies on 50-h hearing testimony in drafting the complaint. However, Movants ignore the original complaint was filed *before* the 50-h examination, and the Amended Complaint contains essentially identical factual allegations. The Amended Complaint essentially only adds state law claims for relief because the statutory waiting period expired in the interim, and merely indicates that further filming permits have continued to be denied by the Defendants. Movants' sole basis for contending the Amended Complaint was drafted in reliance on the 50-h testimony is to cite ¶32 of the Amended Complaint. However, ¶32 merely pleads compliance with the N.Y. Gen. Mun. L. requirement of service of a Notice of Claim and submission to a 50-h Examination.

Moreover, at the 50-h Examination the Village's attorney never asked DeRosa the bases for the allegations of the original Complaint herein (which contained essentially the same factual allegations as the Amended Complaint), and never even showed or questioned him about it.

## POINT II – PLAINTIFFS STATE VIABLE CLAIMS UNDER §§1981, 1983 & 1985

Movants advance the following three arguments to attack Plaintiff's claims asserted under §1981 (invidious discrimination) and for conspiracy liability under §§1985 and 1983: (1) the pleaded allegations of Movants' discriminatory motives and participation in discrimination are purportedly "conclusory"; (2) 31FO has conducted numerous religious events at the Property and therefore supposedly 31FO suffered no "damages" from Movants' discriminations; and (3) 31FO lacks standing because as a limited liability company it supposedly must establish its own "imputed identity" as a Hindu religionist or as an Indian/South Asian (or is it "dark skinned"?) person. The claims are meritless.

We address Movants' arguments seriatim,[2] after identifying the elements of each claim.

"To establish a claim under 42 U.S.C. § 1981, plaintiffs must allege facts supporting the following elements: (1) plaintiffs are members of a racial minority [or otherwise have standing]; (2) defendants' intent to discriminate on the basis of race; and (3) discrimination concerning one of the statute's enumerated activities [such as interfering with a 'contract']." Hu v. City of N.Y., 927 F.3d 81, 102 (2d Cir. 2019).[3]

"The elements of a claim under § 1985(3) are: '(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the

---

[2] While Article III standing is a threshold issue, the issue is more readily addressed after a full exposition of Movants' alleged discrimination and conspiracy with the Village.

[3] The Amended Complaint expressly pleads, *inter alia*, that Plaintiff's contracts with filming companies and others were harmed and interfered with as the direct result of Defendants' discriminatory acts (AC ¶251). Moreover, Movants do not argue the Amended Complaint does not sufficiently allege similarly situated individuals were treated differently, and it is too late for Movants to make such assertion for the first time on reply. In any event, "[t]he section 1981 standard for determining whether a plaintiff and a comparator are similarly situated is identical to the similarity standard for a [selective enforcement] Equal Protection claim." Hu, 927 F.3d at 101. That standard is merely that the plaintiff's and comparator's circumstances "bear a reasonably close resemblance." Id. at 96. As shown in Plaintiff's opposition to the Village's dismissal motion (Point II thereof), the requirement is clearly met here.

laws, ...; (3) an act in furtherance of the conspiracy; (4) whereby a person is ... deprived of any right of a citizen of the United States.'"" Brown v. City of Oneonta, 221 F.3d 329, 341 (2d Cir. 2000). The "conspiracy must [] be motivated by some racial or perhaps otherwise class-based, invidious discriminatory animus." Britt v. Garcia, 457 F.3d 264, 270 (2d Cir. 2006).

"To state a conspiracy claim under § 1983, a plaintiff must show '(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." Pangburn v. Culbertson, 200 F.3d 65, 72 (2d Cir. 1999); Reinhardt v. City of Buffalo, 2022 WL 2442300, *10 (W.D.N.Y. 2022).

Movants' Preliminary Statement erroneously argues that §1983 conspiracy claims cannot be asserted against them because they are "private actors" alleged to be conspiring with state actors.[4] Further into their memorandum, however, they are forced to concede that the exact opposite is true, and that §1983 conspiracy claims are fully applicable to private actors who conspire with state actors. Pangburn, 200 F.3d at 72.

Additionally, even though Movants are not required to be state actors to be held liable for engaging in a §1983 conspiracy with the Village Defendants, it is further notable that Movants' pleaded conduct also satisfies the Supreme Court's expansive definition of "state actors" because, *inter alia*, Movants allegedly officially functioned under "color of [] statute" and acted with illegal veto-power to block municipal permits. Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n, 531 U.S. 288, 302 (2001) (private entities whose actions are "entwined" with functions of a state are state actors); Horvath v. Westport Library Ass'n, 362 F.3d 147, 151 (2d Cir. 2004) ("[s]tate action may be found . . . where an activity that traditionally has been the

---

[4] Section 1981 and 1985 claims plainly apply to private actors. Runyon v. McCrary, 427 U.S. 160 (1976).

exclusive, or near exclusive, function of the State has been contracted out to a private entity").

No "heightened" pleading standard applies to conspiracy claims. Reinhardt at *10 (citing Leatherman v. Tarrant Cnty., 507 U.S. 163, 166 (1993) (prohibiting application of a "heightened pleading standard" in civil rights cases)) & at 11 (discussing additional case law demonstrating that regular Iqbal "plausibility" applies). "Although 'completely unsubstantiated allegations of conspiracy are insufficient to state a claim for relief under § 1983' [citation omitted], 'conspiracies are by their very nature secretive operations, and may have to be proven by circumstantial, rather than direct, evidence." Id. (quoting Pangburn, 200 F.3d at 72 (cleaned up)). The claim is subject only to Rule 8's "plausible" pleading standard. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007) (only Rule 8's "plausibility standard" applies to pleading conspiracy claims under the Sherman Act; "we do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face"); Hoskins v. Poelstra, 320 F.3d 761, 764 (7th Cir. 2003). Whatever the standard, the Amended Complaint amply meets it.

### A.   Discrimination, Retaliation, and Conspiracy

As shown in Plaintiff's opposition to the Village's dismissal motion (Point II thereof, incorporated herein), Plaintiff amply pleads that it was discriminated and retaliated against by all Defendants on the basis of religion, race, and its exercise of its right to petition the Courts.

Ignoring Plaintiff's actual pleading, Movants falsely assert there is no allegation that one of their members were the ones who made the racist and religiously intolerant report to the Village concerning the Hindu Religious Retreat that began the harassment of 31FO, or had any involvement with any of the remaining Village misconduct, or that there was any "meeting of the minds" between the Road Association Defendants and the Village. The Amended Complaint itself establishes the complete opposite is true. For example:

"it was a member of the Road Association who complained about seeing **dark-skinned**

**people in all white robes**" at the Property'" (AC ¶187).

The Amended Complaint further alleges that the foregoing complaint from the Road Association member directly compelled the Police Chief to send 31FO a fax objecting to the Hindu Religious Retreat quoting Village Code prohibitions against activity which "*Tends to disturb or annoy **the residents of the Village***" or "*Is obnoxious or offensive to the surrounding community by reason of causing or emitting unreasonable levels of odor, … noise or vibrations*" (AC ¶89) (emphasis added).

The Amended Complaint further states the Road Association and Shapses participated with the Village in their immediate discrimination against 31FO because of the Hindu Religious Retreat by barring the long-planned Charity Event:

> 188. It was a member of the Road Association, indeed its President Shapses, to whom the Village turned [] when it needed a neighbor affidavit in opposition to Plaintiff's State Court lawsuit, and Shapses duly provided one which was riddled with overt and deliberate falsehoods.

The Amended Complaint further alleges that Road Association President Shapses made numerous false sworn statements in assisting the Village in its opposition to 31FO's state court lawsuit objecting to the illegal and discriminatory barring of the Charity Event, including:

> 201. For example, in an affidavit dated September 30, 2019 which Mr. Shapses submitted in his capacity as President of the Road Association and on his own behalf "as a long-time resident of the Village" to "vehemently oppose" the use of the Subject Property for the 2019 Charity Event, Mr. Shapses disingenuously and falsely: (1) attempted to portray the 2019 Charity Event as a commercial event based on his false representations (which he falsely represented was "new information" he had allegedly received) that Plaintiff was being compensated for the event, and based on speculation as to the possible number of attendees; (2) falsely claimed that only small, non-commercial events were held on the Subject Property when it was owned by prior owners; and (3) falsely asserted, without factual basis, that "restrictions to ensure resident, pedestrian, and motorist security" were required to avoid "great risks to the health, safety, and welfare of the community and its residents."

> 202. Each of these statements made in support of Mr. Shapses' "vehement" opposition to the 2019 Charity Event was false, misleading and devoid of merit:

> a. Plaintiff was not compensated for the 2019 Charity Event; …. [multiple further

subdivisions showing that deliberate flagrant falsehoods contained in Shapses's sworn Affidavit he and the Road Association submitted to stop the Charity Event]….

e. No neighbors indicated any objection to filming taking place at the Property when the Production Company informed them of such intent on June 14, 2021; …

The Amended Complaint further specifies that the Village pandered to the Road Association and President Shapses in enacting the completely illegal and unconstitutional Local Laws 1 and 2 and, in addition to all of the other constitutional infirmities of those laws identified in great detail, included an illegal provision giving the Road Association effective "veto" power over permits, in direct violation of Due Process[5] (AC ¶¶147-148).

The Amended Complaint further pleads the Road Association and Shapses took full advantage of their illegal veto power, knowing full well they were acting in direct violation of 31FO's express deeded rights to have its invitee film crew drive over the road leading to 31FO's property, with Shapses admitting outright that he and the Road Association would never approve it and their attorney instead delaying consideration of the approval until it was too late:

185. Thus, as of June 9, 2021, it appeared that the Village Clerk and the Police Chief had no remaining safety or other concerns about the possibility of a film shoot at the Property. But in reality, the Village Defendants, conspiring with defendants Shapses and the Road Association [(collectively "Defendants" as per ¶30)], were stringing Plaintiff along, knowing they would ultimately withhold or refuse to issue the permit application at the last minute.

…. 186. Upon information and belief, Shapses and the Road Association (of which Shapses is President) have actively conspired with the Village and the Village Defendants since 2019 to discriminate and retaliate against and deprive Plaintiff of its rights to use the Property as it has been used for decades, out of racial and religious animosity, because Plaintiff has invited on multiple occasions South Asian/Indian persons, who conducted a Hindu silent religious retreat and later an Indian wedding, and to retaliate against Plaintiff for having exposed their racist conduct in the previous State Court action and having obtained the partial TRO and

---

[5] See Coates v. City of Cincinnati, 402 U.S. 611 (1971) (ordinance making it illegal to make noise "*annoying to persons passing by*" unconstitutional); People v. Stephens, 28 N.Y.3d 307, 314 (2016) (ordinance allowing "*arbitrary and discriminatory enforcement according to the malice or animosity of a cantankerous neighbor*" unconstitutional)); Concordia Collegiate Inst. v. Miller, 301 N.Y. 189 (1950) (neighbor approval law allows for discrimination and is unconstitutional); Hill v. Colorado, 530 U.S. 703, 732 (2000) (a law is unconstitutionally vague if "*it authorizes or even encourages arbitrary and discriminatory enforcement*").

the "So Ordered" Stipulation.

…. 190. … [N]otwithstanding that Plaintiff did not agree that Local Law 1 applies or is enforceable, Plaintiff's counsel sent a letter to counsel for the Village on June 9, 2021, which showed that all of the purported permit requirements set forth in Chapter 151 of the Village Code were duly complied with, including that "[f]or property located on a private road, the applicant shall also provide written approval allowing access over the private road to the filming site from either the road association, homeowners' association or road owner" (§ 151-4).

191. In fact, the letter of Plaintiff's counsel attached a copy of Plaintiff's Deed to the Property which shows that Plaintiff has ownership in common rights over the subject Fort Hill Road, including the "right of ingress to and egress for all purposes from said premises in common with others over Fort Hill Drive". The letter accordingly requested: "Please let us know by the close of business tomorrow, Thursday, June 10, 2021, whether the Village agrees to issue a Commercial Filming permit for the Showtime Filming Events."

192. On June 11, 2021, counsel for the Village responded and further revealed Defendants' ongoing scheme to discriminate and retaliate against Plaintiff…. stat[ing] that the permit application submitted by Next Step Productions was purportedly "*incomplete for a number of reasons, including but not limited to failure by Next Step Productions, LLC to obtain written approval from the road association allowing access over the private road involved*" …(emphasis added).

194. In other words, notwithstanding that Plaintiff has an actual and deeded ownership "**right of ingress to and egress for all purposes from said premises in common with others over Fort Hill Drive,**" and notwithstanding that § 151-4 provides that if approval of the "road owner" is given then no other approval is necessary, and notwithstanding that it is illegal and unconstitutional for a zoning law to defer to neighbor or road association approval, the Village purported to insist on approval of the Road Association, knowing full well that the Road Association and its President Shapses were already conspiring with the Village to discriminate and retaliate against Plaintiff and to prevent issuance of the permit—effectively conferring an illegal "veto power" on the Road Association.

195. On June 14, 2021, Shawn Cassidy of production company Next Step Productions (a/k/a the "Production Company") submitted an amended application to Village Clerk Jill Cervini. A Production Company representative also notified the neighbors of the impending film shoot and informed Plaintiff that this had been done.

196. On June 14, 2021, a Production Company representative, Josh Dorn, contacted the President of the Road Association, defendant Ted Shapses, who promptly informed Mr. Dorn that the Road Association would not allow any filming at the Property.

197. On June 15, 2021, an attorney for the Road Association purported to back-peddle Mr. Shapses's overt threats and denials, purporting to defend Mr. Shapses's conduct on "timing" or "completeness" grounds, but nevertheless stating that the Road Association refused to immediately indicate whether or not it objects to the use of the private road by Plaintiff's invitees, even though Plaintiff's actual Deed provides that the Road Association is

prohibited from interfering with Plaintiff's use of the road for any purpose.

198. In addition, and in any event, the Road Association, through the actions and statements of its President, Ted Shapses, had already unilaterally reported on behalf of the Road Association that it would prevent the Production Company and all future applicants from obtaining any film permits for shooting at Plaintiff's Property, notwithstanding that the Village Clerk and Police feigned to have no objection to the issuance of any such permit(s) and, in fact, responded favorably to all communications from the Network and its agents, including the Production Company.

199. Mr. Shapses did not indicate that he had conferred with or otherwise solicited the opinions of any members of the Road Association before stating that he would not allow any filming at the Property, and without limitation, David DeRosa, who is a member of the Road Association by virtue of Plaintiff's ownership of the Property, was not contacted by Mr. Shapses or the Road Association to solicit his approval or disapproval of the use of the private road by the Production Company.

200. The inherently subjective nature of the Road Association's and Mr. Shapses' refusal to allow any filming permits to be issued for film shoots at the Property is evidenced by a pattern of discrimination and hostile behavior, including but not limited to prior misleading statements made by Mr. Shapses, in his capacity as Road Association President and personally, with respect to Plaintiff's activities at the Property and Mr. Shapses' insertion of his personal stance into the State Court action.

The Amended Complaint further alleges that after 31FO complained to the Village about Shapses' statement that he on behalf of the Road Association would not allow the filming, the Road Association pretended it had no time to "review" the request and made certain to foot drag until it was too late for the filming which then led to its cancellation:

203. After Plaintiff's attorney wrote to the Village's attorney on June 14, 2021, complaining of the Village's requirement of approval of the Road Association, which approval the Road Association through its President outright rejected, on June 15, 2021, the Road Association purported to disavow its President's actions while pretending that it had no time to "review" the matter, ignoring the fact that it was its own President's conduct, in close coordination with the Village Defendants, that led to the delay.

204. In any event, all that was at issue for the Road Association was the film crew driving over the roadway, which Plaintiff has the absolute right to allow under its Deed, and the Road Association had and has no right to prevent Plaintiff to allow its invitees to use the roadway to access Plaintiff's Property; accordingly, the Road Association could have and should have easily signed off on it immediately.

205. Filming was scheduled to begin on Monday, June 21, 2021, with prep to begin June 18, 2021, after months of planning, coordination, and commitments. Because of the illegal actions of all of the Defendants, the filming at Plaintiff's Property did not take place,

Plaintiff lost the substantial compensation it was to be paid for the filming, together with the loss of good will and substantial interference with additional prospective film shoots.

206. Upon information and belief, no other filming permit application in the Village was subjected to the discriminatory, retaliatory and illegal treatment to which Plaintiff's application was treated by all of the Defendants.

The Amended Complaint further alleges that when another filming application for a different company was made, the Village again gave the Road Association illegal veto power over it, the Road Association again illegally failed and refused to provide its consent, and it again delayed the matter, this time with an overtly untruthful claim that the road was purportedly unpassable until the filming could not occur (AC ¶¶208-210).

The Amended Complaint further alleges the Road Association inadvertently included the filming company's representative in an internal email which confirmed Movants' abject animosity (AC ¶¶211-212); and that the film company's representative forwarded the email to 31FO, reported and called out Movants' flagrant misconduct, after which the Road Association rested its denial of the request for approval based on the abjectly false pretense that the road was supposedly not usable, and that the film company's representative responded in writing exposing the Road Association for its baseless and wrongful conduct (AC ¶¶213-215).

The Amended Complaint further alleges 31FO made multiple and repeated other filming permit applications thereafter, each time the Road Association wrongly did not approve them, film scouts reported this was completely discriminatory, and any further applications would be futile (AC ¶¶216-219[6]). It additionally alleges:

---

[6] ¶216 of the Amended Complaint supplements the allegations of the original Complaint to more particularize further damages occurring after the dates address in the original Complaint (compare AC ¶¶ 215-217, and the original Complaint ¶¶212-213), which itself had stated the misconduct and damages were continuing (Complaint ¶¶213-214). It references the 50-h transcript, an 8/25/22 letter of Plaintiff's counsel, and other communications. Defendants do not rely on the 50-h transcript as it pertains to these later incurred damages, and instead purport to rely on it to challenge all of the other allegations of the Amended Complaint, essentially all of which were in the original Complaint filed long before the 50-h examination and not based upon that later examination.

220. Because of the lost filming, Plaintiff has lost enormous income and revenues of over a million dollars and will continue to suffer enormous damages unless Defendants cease their illegal conduct.

The Amended Complaint further alleges the discriminatory first Cease and Desist Letter, and the discriminatory second Cease and Desist Order,[7] were both issued by the Village at the behest of and in conspiracy with the racist and discriminatory Road Association Defendants:

223. The Cease & Desist Letters issued by the Village and upon information and belief at the behest of all of the Defendants acting in concert with each other, contained a directive that Plaintiff cease and desist all future events at the Property, which includes charitable, religious, and racially diverse events, on pain of threatened criminal enforcement. They were issued, in whole or in part, in an effort by the Village Defendants, in conspiracy with Shapses and the Road Association, to directly interfere with and prevent charitable, diverse religiously-affiliated, and racially diverse events on the Property.

Further still, the Amended Complaint alleges that Movants did not object to any events or filmings at the Property (enumerated in great detail) conducted before the Hindu Religious Retreat, and diametrically changed course only after and based on the Religious Retreat. (AC ¶¶202(e)-(f), 207, 229 ("the previous owners of the Property hosted numerous commercial and noncommercial events without interruption or complaint by the Village, the Road Association, or Shapses"); see also 71-84, 99-104, 110).

Moreover, in the 50-h transcript upon which Defendants improperly rely, even if it were reviewable upon this motion, it is shown even further that Movants fully instigated and participated in the discrimination and discriminatory conspiracy from the start and to this day.

---

[7] The first Cease and Desist Letter was issued two weeks after the Hindu Religious Retreat and Defendants' "racist behavior and religious intolerance ([and with the same day] the Police Chief boldly add[ing]: '**With all the terrorist activity happening in the world, can you blame the[ neighbors for calling in the police]?**')" by demanding that similar events at Plaintiff's private estate cease (AC ¶¶3, 187). Moreover, the second Cease and Desist Order was issued after an Indian wedding by 31FO's investor's family was held at the Property and "because a neighbor observed that the Property on March 20, 2021 was used for a small religious gathering for Easter" (specifically, 31FO's principal's church choir prepared a pre-Easter service to be shown to the congregation during an Easter service conducted online because of the COVID epidemic) (AC ¶¶128, 166, 168).

David DeRosa testified that it was Shapses (among others) who made the racist and religiously intolerant statements; it was Shapses who took photographs of the silent retreat and brought them to the Village Police; and that the turnabout in the treatment of 31FO as a result of Shapses and the other racist and religiously intolerant neighbors was stark (at pp. 99-100):

> Q. You also mention in your Notice of Claim that, quote, racist neighbors complained to the village's private police about seeing dark-skinned people in all white robes, closed quote. Can you identify who those racist neighbors are that you're referring to?
>
> A. I can tell you Tagliari (phonetic) in the corner certainly filled out a report. I seen the people there that <u>Shapses</u> put in his own deposition as soon as he saw the people there, brought pictures of them. Went, I believe -- <u>he was the one that went on the property and questioned who was there even though it was my property and brought pictures down to the police department</u>. Facebook, we pulled some things off Facebook where people were talking about the fact that there were black people at the property and people in robes. When the police chief called me up, he said he was inundated with calls about the fact there were black people at the property or dark-skinned people at the property and people in robes and various people were bringing him pictures or E-mailing pictures. It was an onslaught. We had friends who live in the area that were getting texts from people all over the place about black-skinned people being on the property, what is it they're planning on doing. Before Memorial Day of that year and after, there's like two different lives. We had just as many retreats with people going on they were white. Everything before was a nonissue. Everything after was as if an explosion happened (emphasis added).
>
> Q. Did you hear Mr. Shapses say the words dark-skinned people in all white robes?
>
> A. I did.

DeRosa further explained at length (at pp. 106-107) that Shapses had in fact made the racist and religiously intolerant statements directly to him, that during the silent retreat Shapses had in fact gone to the Property, saw that the participants had taken a vow of silence, Shapses had spoken to one of the participants who for logistical reasons was able to speak, the solemn silent event was fully explained to him, and yet Shapses nevertheless proceeded to complain to Village Police about the dark-skinned people in all white robes, and that DeRosa told him this was completely contrary to how he and the Village had treated identical prior religious retreats at the property (where the participants were of a different color and religion):

He [Shapses] said … that there were these people on the property, I [Shapses] approached them and talked to them. I said, who did you approach? He told me, I approached the dark-skinned people sitting in a circle. I asked them about why they were there, the reason they were there. He said that someone offered for him to join them. Most of the them couldn't talk, but there was one person who had permission to talk. He was actually explaining to me more what was going on than I understand as far as the process. He told me he filed a complaint with the police department. He told me he brought them pictures. He told me a whole gamut as far as what was going on as to what he looked at. I said to him at the time, I said it was a partner, I'm not sure why everybody became so crazed as far as what was going on, that I never had single complaint before then. That we had had numerous people there for retreats, numerous people on the property, numerous circles of people sitting down and no one said a single word and this had been like nuts.

DeRosa further testified that Shapses stated outright to multiple film production representatives that Movants would never consent to any permits (p. 223). DeRosa additionally explained how the Defendants used the Road Association as the means of denying all permits:

The village does not deny, they just don't issue the permit. They don't issue the permit because the permit has to be signed -- the permit has to be signed by the Road Association and Shapses, who they appointed as the governor. They knew perfectly well he was never signing anything. ….

Additionally, as to the number of permits that were totally blocked, DeRosa testified (at pp. 237-238):

A. There were probably well over twenty permits that they refused to issue because the Road Association would not sign off. We did not need to go to the village to be denied because we already would wait for Shapses to do or say something, say I'm not signing off on anything. There was no need to go to the village at that point. In the beginning we were sending people to the village, which was a mistake, wasting their time, and they were getting angry. The village would work out everything, the police, the police department being paid a specific amount, you name it. I didn't think the village thought they were going to be doing these things because the police thought we have overtime. But after the production job, I think which was with the first company, she had mentioned she had gone through such an extent to get the approval and then was turned down by Shapses, after that point anybody that contacted us, which became more and more limited, we sent them to him first before we would have them get involved with the village.

In sum, Movants' cursory contention that they are mere complainants to the Village and therefore cannot be said to have conspired with the Village, ignores that their alleged conduct went far further—they caused not just the Police to act, but also the Village Mayor, Board,

Building Inspector, and Village Clerk to deprive Plaintiff of its constitutional rights. They caused

the Village to illegally and unconstitutionally bestow on them (the complainants) veto power

over any permits sought by Plaintiff, and they actively participated with the Village to block and

deny permits to Plaintiff. As the Court in Reinhardt v. City of Buffalo, 2022 WL 2442300, at *10

(W.D.N.Y. 2022), recently explained, willful participation in official discrimination establishes

conspiracy, including civil rights conspiracy:

> courts have long held that private individuals who conspire with government officials to deprive an individual of their constitutional rights are transformed into state actors subject to § 1983 liability. This is because proof of such a conspiracy establishes that the private action was taken under color of state law. See Dennis v. Sparks, 449 U.S. 24 (1980) (finding a private person to act under color of state law where he conspired with a judge to violate due process rights of plaintiffs); Adickes v. S.H. Kress & Co., 398 U.S. 144, 152 (1970) (where a private restaurant "is a willful participant in joint activity with the State or its agents," to discriminate against Black customers, proof of the conspiracy established the restaurant acted under color of state law and could be held liable under § 1983); see also 5 Martin A. Schwartz, SECTION 1983 LITIGATION CLAIMS AND DEFENSES, § 5.16 Joint Participation Doctrine (4th ed. 2022) ("[S]tate action is present when private persons act jointly or in concert with public officials."). At least one court in the Second Circuit has applied this "joint action" test in the context of bail enforcement agents, concluding that an agent who "operated as a willful participant in a joint activity with the State or its agents, or act[ed] together with state officials or with significant state aid," is transformed into a state actor for purposes of § 1983. Lopez, 2015 WL 5657361, at *6 (quoting Abdullahi v. Pfizer, Inc., 562 F.3d 163, 188 (2d Cir. 2009)).

Incredibly, upon this dismissal motion, Movants boldly argue that the extensively

pleaded allegations that the Road Association has denied and will continue to deny and delay

every film and other permit to the point where the filming cannot take place should not be

believed. Movants argue that when they falsely pretended Fort Hill Road was unpassable, as

expressly pleaded (AC ¶¶210-215), they were supposedly telling the truth. They claims that yes,

there were delays in every permit application such that they never have in fact ever approved a

single permit application on behalf of Plaintiff, but that should be excusable. Or, improperly

relying on self-serving extrinsic evidence taking the form of their own litigation attorney's recent

letter purporting to impose conditions for their *consideration* of a yet-further filming permit

application, including security, sketches, on-site sanitary arrangements, on-site parking, Department of Health permits, and other requirements identified in its prior letters (which further purported to demand insurance and other onerous conditions), they contend they supposedly are willing to "work with" 31FO. To state the obvious, denials of pleaded allegations are not a basis for Rule 12 dismissal, and Movants' attorney's self-serving letter, which purports to impose numerous onerous and time-consuming pre-conditions to the Road Association's willingness to even consider filming permits, is directly contrary to 31FO's deeded "right of ingress to and egress for all purposes from said premises in common with others over Fort Hill Drive."

**B.    <u>Damages</u>**

Movants speciously argue that given numerous religious events at the Property which 31FO has conducted, Plaintiff has no damages. The Amended Complaint (as well as DeRosa in the improperly cited 50-h transcript, see e.g., pp. 233, 237-238) extensively establishes that carrying out their discrimination, Movants have denied numerous filming permits, have constantly harassed Plaintiff and subjected it to a multitude of warrantless and illegal entries and searches, and caused other extensive damaged. <u>See</u>, <u>e.g.</u>, AC ¶¶217-220; 228-236.

**C.    <u>Standing</u>**

Movants argue that 31FO, as an LLC, lacks standing to assert discrimination based on religion or race, and must prove "imputed identity" as Hindu religionists or as Indian/South Asian or maybe as "dark skinned" person persons. Notably, Movants persist with this meritless assertion even after it was shown to be directly contrary to binding legal authorities cited in Plaintiff's pre-motion letters, and without even purporting to distinguish the binding case law.

At the outset, Movants' entire premise is wrong. The Amended Complaint extensively alleges that Fort Hill—being a former Jesuit retreat (AC ¶45), used by 31FO for a Christian pastor's retreat, a Hindu silent retreat, and is continually involved in religious and racially

diverse events—identifies itself as an entity that wishes to engage in extensive religious and

racially diverse activities, for which it is being directly punished by Defendants:

> 221. Plaintiff and its owner support and endorse charitable and religiously-affiliated organizations, and wish to foster and utilize Plaintiff's Property for racially and religiously diverse individuals and events. Moreover, Plaintiff has petitioned and wishes to continue petitioning the courts with respect to Plaintiff's rights in the use of the Property.

> 222. By prohibiting and substantially interfering with Plaintiff's rights and efforts to host charitable events and religiously-affiliated organizations at the Property, and by engaging in retaliatory and discriminatory actions against Plaintiff for having invited onto its Property racially diverse individuals and religiously diverse organizations, and for holding events with racially diverse persons in attendance, and for having petitioned the courts with respect to Plaintiff's rights in the use of the Property, the Defendants, acting in concert with each other, are directly impairing and restricting Plaintiff's ability to endorse charitable, religious causes of Plaintiff's choosing, from associating with racially diverse individuals and religiously diverse organizations and persons, from exercising its right not to discriminate based on race or religious affiliation, and from petitioning the courts, and intend by their conduct to have a chilling effect on Plaintiff, its principals, and others in exercise of their First Amended rights.[8]

Further, in the improperly cited 50-h transcript, DeRosa extensively showed that 31FO

has allowed many religious events and racially diverse uses of Fort Hill, every one of which was

without any compensation, and in keeping with its ethos (pp. 26-32; 75-88; 135-157).

In any event, as shown in 31FO's September 6, 2022 opposition to Defendants' pre-

motion letters, and simply ignored by the Road Association Defendants (the Village properly

abandoned this argument by no longer asserting lack of standing in its supporting memorandum):

> Imputed Racial Identity. Defendants' argument that Plaintiff lacks standing unless it can satisfy the "imputed racial identity" theory is misplaced and unavailing.

> At the outset, Defendants ignore Plaintiff's facial challenges to the local laws, ignore Plaintiff's Fourth Amendment illegal and warrantless search claims, ignore Plaintiff's non-invidious retaliation claims (e.g. for exercise of the right to petition the courts and other First

---

[8] Nothing supports the claim of the Road Association's Memo. (at p. 11) that to make out an "imputed identity" the entity's "primary purpose" must be to serve a racial or religious group. The case it cites in support, Bibliotechnical Athenaeum v. Am. Univ. of Beirut, 527 F. Supp. 3d 625, 634 (S.D.N.Y. 2021), aff'd, 2022 WL 710896 (2d Cir. Mar. 10, 2022), only quoted the complaint as factually alleging that the entity there had a primary purpose of fighting discrimination; it did not contend "primary purpose" is an element. The decision rested on a lack of causation, after assuming racial identity.

Amendment rights), and ignore Plaintiff's other non-invidious discrimination claims, none of which even arguably requires "imputed racial identity" standing.

Moreover, even with respect to Plaintiff's invidious discrimination claims, Defendants' reliance on imputed racial identity is unavailing. For one, the requirement of imputed racial identity has been sharply criticized—indeed, the Fifth Circuit recently expressly rejected such requirement. See White Glove Staffing, Inc. v. Methodist Hospitals of Dallas, 947 F.3d 301 (5th Cir. 2020).[9] In any event, 31FO has standing to assert racial discrimination claims because Defendants are discriminating against Plaintiff *based on its activities and functions involving persons of South Asian/Indian descent, African Americans, and other non-Caucasian persons*. In Hudson Val. Freedom Theater v. Heimbach, 671 F.2d 702 (2d Cir. 1982), the Second Circuit held that if a corporation was racially discriminated against based on its "*activities,*" including the racial makeup of some of those whom it serves, then standing is established. Id. at 706 ("It is not apparent why a corporation, although entitled to advance equal protection challenges based on inequality in taxation or regulation, should lack standing to complain of discrimination because of its activities or stock ownership based on racial grounds") (emphasis added). Thus, courts in this circuit reviewing discrimination claims by corporations or LLC's routinely hold that "a plaintiff does not have to be a member of a racial minority to bring a claim under Section 1981; a non-minority plaintiff can allege personal injury stemming from a defendant's discriminatory conduct against a racial minority." Ctr. for Transitional Living, LLC v. Advanced Behavioral Health, Inc., [2021 WL 3409512, *7] (D. Conn. Aug. 4, 2021) (quoting Robledo v. Bond No. 9, 965 F. Supp. 2d 470, 476 (S.D.N.Y. 2013); and citing CBOCS West, Inc. v. Humphries, 553 U.S. 442, 457 (2008) (holding that § 1981 protects against retaliation); Albert v. Carovano, 851 F.2d 561, 572-73 (2d Cir. 1988) (en banc) ("non-minority plaintiffs may bring an action under Section 1981 against one who has retaliated against them because they did not engage in purposeful racial discrimination in a contractual or marital context")). The same applies under §§ 1983 and 1985. Further, in addition to interfering with 31FO's filming and other "contracts" based on their racial discrimination, Defendants do not question that an "investor" in a company also has a "contractual" relationship with that company within the ambit of § 1981, such that discrimination interfering with that relationship is likewise actionable.

## POINT III – PLAINTIFF STATES VIABLE STATE CONSTITUTION CLAIMS

Movants' sole argument with respect to Plaintiff's state constitutional claims is to rely on the same contentions Movants make in connection with the federal claims. As shown, those arguments are without merit. Further, Movants make no effort to actually address the New York State Constitution.

---

[9] "The Fifth Circuit joined the better side of a widening circuit split in adopting, and extending to new factual terrain, a corporate standing test that focuses on the harm the corporation suffers instead of the corporation's judicially constructed race". Article, 134 HARV. L. REV. 872.

## POINT IV – PLAINTIFF'S EIGHTH AND NINTH CLAIMS ARE AMPLY PLEADED

First, like the Village Defendants, Movants do not address or seek dismissal of the eighth claim for relief, which seeks declaratory judgment against all Defendants that Local Laws 1 and 2 are unconstitutional and seeking to prevent them from enforcing those local laws.

Plaintiff's ninth claim seeks a declaratory judgment declaring that by reason of 31FO's deeded rights to travel over and have its invitees travel over Fort Hill Road to reach plaintiff's Property (Fort Hill), the Road Association is obligated "to sign off on filming permit and any other permits or approvals required by the Village for Plaintiff's use of its property, upon demand and expeditiously", and other declaratory relief (AC ¶267). Turning 31FO's Deed on its head, Movants contend the Deed does not give 31FO's a non-exclusive right of ingress and egress over Fort Hill Road for all purposes, including for its invitee film crews to reach its Property. A copy of the Deed is attached as Movants Exhibit D (as to which Plaintiff does not object and has not objected). It expressly provides (at p. 3) at its Schedule A that the property conveyed by the prior owner includes:

> … a **nonexclusive right of ingress to and egress for all purposes** from said premises in common with others over Fort Hill Drive ….

As if they had never before seen a deed, Movants argue that the first page of the Deed, where it states that the Property conveyed is that described in Schedule A, "TOGETHER with all right, title and interest, if any, of the party of the first part in and to any streets and roads abutting the above described premises to the center lines thereof," somehow restricts Schedule A. Movants' argument is not clever—it is frivolous. "TOGETHER with" is not restrictive.

Movants improperly attach as their Exhibit E a 1969 document which they contend is an easement affecting Fort Hill Road, and which in fact appears to do nothing more than provide for road "maintenance," not ingress or egress rights. *First*, this document is not referenced or

incorporated into the Amended Complaint and is not properly considered. *Second*, there is no claim even by the Road Association that it ever propounded this document to 31FO. *Third*, 31FO's Deed does not appear to refer to it. At its p. 3, the only 1969 document it references is a 1969 map, not any agreement. *Fourth*, the document does not purport to limit the adjoining property owners who created Fort Hill Road (most particularly the owner of Fort Hill itself) from using the road to access their properties and seems to only provide for road maintenance.

### POINT V – PLAINTIFF STATES A VIABLE CLAIM UNDER N.Y. EXEC. L. §296

Plaintiff states a viable claim under N.Y. Exec. L. §296 (Unlawful discriminatory practices). See N.Y. Exec. L. §296(5)(b)(1) & (2) (discriminatory interference with the use of "land or commercial space"); §296(5)(d) (discrimination by real estate board); §296(6) (aiding and abetting prohibited discrimination); §296(7) (retaliation and discrimination against party who opposes prohibited discrimination). Movants make no effort whatsoever to address the law other than to contend that Plaintiff's §296 claim should fail for the same reasons as the federal claims, while further ignoring that discrimination under §296 is far easier to establish than for federal constitutional claims. See generally N.Y. Exec. L. §296 *passim*.

### POINT VI – PLAINTIFF STATES A VIABLE TORTIOUS INTERFERENCE CLAIM

Lastly, contrary to Movants' claim, the Amended Complaint expressly pleads the Road Association Defendants acted "for the sole purpose of harming Plaintiff" (AC ¶¶227), and amply shows this (AC ¶¶186-229). Moreover, it alternatively expressly pleads and shows that Movants "used dishonest, unfair or improper means to interfere with [Plaintiff's contractual] relations" (AC ¶¶227, 186-229). 16 Casa Duse, LLC v. Merkin, 791 F.3d 247, 261 (2d Cir. 2015).