FILED
CLERK

2:37 pm, Sep 29, 2023

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

31FO, LLC,

                             Plaintiff,

                -against-

INCORPORATED VILLAGE OF LLOYD
HARBOR, JEAN M. THATCHER, individually
and as Village Mayor, THOMAS KRUMPTER,
individually and as Village Police Chief, JAMES
SINO, individually and as Village Building Inspector,
JILL CERVINI, individually and as Village Clerk,
TED SHAPSES, individually and as President of the
Fort Hill Beach and Road Association, and FORT
HILL BEACH AND ROAD ASSOCIATION, INC.,

                          Defendants.

**MEMORANDUM & ORDER**
CV 22-3303 (GRB)(ARL)

------------------------------------------------------------------X

**GARY R. BROWN, United States District Judge:**

        Like a party clown twisting a balloon into the shape of a dog, a duck or a frog, counsel for plaintiff attempts to contort its own allegations, bend the rules of procedure and misdirect the Court's attention to create the impression that this case—primarily a regulatory land use dispute—centers on actionable racial discrimination.   As performers and partygoers well know, though, no amount of artistry or deception can conjure an actual living creature.  Despite the twists and turns, it remains a balloon.

        In this action, 31FO, LLC has sued the Incorporated Village of Lloyd Harbor, Mayor Jean M. Thatcher, Village Police Chief Thomas Krumpter, Village Building Inspector James Sino, Village Clerk Jill Cervini (collectively the "Village defendants"), the Fort Hill Beach and Road Association, Inc. and its president Ted Shapses (together, the "Road Association defendants"), for

alleged violations of its constitutional and civil rights in connection with a 10-acre historical waterfront estate located in the Village.  Defendants have moved to dismiss the amended complaint pursuant to Fed. R. Civ. P. 12(b)(6). Docket Entry ("DE") 30, 31.   Nearly all of the claims—with the exception of certain Fourth Amendment claims seeking only nominal damages—are improperly plead and therefore must be dismissed.

*Documents Considered on this Motion*

Examining the factual allegations in this case requires identification of the material subject to consideration on this motion.  Most notably, that parties have raised a question as to whether the Court may rely upon the transcript of a hearing held pursuant New York General Municipal Law Section 50-h at which David DeRosa, principal of the plaintiff, provided sworn testimony. Generally, on a motion to dismiss, the Court's consideration is limited to the allegations of the complaint.  In adjudicating a motion to dismiss, the Court must limit itself to the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint and matters of which judicial notice may be taken.  *Colson v. Haber*, No. 13-CV-5394 (JG)(CLP), 2016 WL 236220, at *2 (E.D.N.Y. Jan. 20, 2016).  "Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (*purgandum*)[1].

As a result, courts may refuse to consider a 50-h hearing transcript "unless there is evidence that the plaintiff relied on the 50-h hearing testimony in drafting [its] complaint."  *Doe v. City of New York*, No. 18-CV-670 (ARR)(JO0, 2018, WL 3824133, at *5 (E.D.N.Y. Aug. 9, 2018)).

---

[1] *See Farmers Property and Casualty Ins. Co. v. Fallon*, No. 21-CV-6022 (GRB)(ARL), 2023 WL 4975977, at *3 n.6 (E.D.N.Y. Aug. 3, 2023) (discussing use of "*purgandum*" to indicate the removal of superfluous items for the ease of reading).

Other courts have held that even absent express references in the complaint, a 50-h hearing transcript may be considered in connection with a motion to dismiss.   *Elliot-Leach v. New York City*, 201 F. Supp. 3d 238, 242 (E.D.N.Y. 2016) (50-h transcripts "routinely considered" on motion to dismiss); *Cincotta v. Hempstead Union Free Sch. Dist.*, No. 15-cv-4821 (ADS)(AKT), 2016 WL4536873, *8 (E.D.N.Y. Aug. 30, 2016); *Vessa v. City of White Plains*, No. 12-CV-6989 (ER), 2014 WL 1271230, *4 (S.D.N.Y. Mar. 27, 2014), *aff'd*, 588 F. App'x 9 (2d Cir. 2014); *Rafferty v. Hempstead Union Free Sch. Dist.*, No. CV 18-3321 (ADS) (AYS), 2019 WL 7598671, *2 (E.D.N.Y. Aug. 21, 2019), *adopted by* 2019 WL 5550261 (E.D.N.Y. Oct. 28, 2019).  The Court need not reach this issue as, in this case, the question is not even close.

In its fervent arguments on this issue, plaintiff has exceeded the bounds of zealous advocacy through a wanton display of duplicity.   One need not go further than the second page of plaintiff's reply argument to discover instances in which the plaintiff cites portions of the 50-h transcript to support points it seeks to establish.  *See* DE 30-10 at 4 (providing multiple cites to 50-h proceeding to support assertions such as, "Movants themselves spearheaded the discrimination and directly conspired with and caused the Village to discriminate against Plaintiff.").  Yet, *on the very next page*, counsel condemns defendants' "flagrant and improper . . . reliance" on the 50-h transcript.  *Id.* at 5; *cf. id.* at 15-16, 19 (additional examples of plaintiff's reliance on 50-h testimony for various propositions).  Thus, plaintiff would have this Court examine the 50-h transcript with one eye closed, focusing only on portions it believes helpful.[2]

---

[2] This is not the only way plaintiff's counsel played fast and loose with the facts and the rules.  Another example is counsel's continue reference to the subject retreat as a "Hindu Religious Retreat" when its representative testified that the event was non-denominational and he does not know whether Bhargava "self-identifies" as Hindu.  *See* DE 30-3 (hereinafter "Tr.") at 97-98.  Further, as defendants properly note, in its filings, plaintiff deployed several typographical and stylistic tricks to thwart page limits. *See, e.g.*, DE 30-10 at 19-20 (setting large blocks of argument in single space).  Despite their unwieldy length, plaintiff's submission remain long on rhetoric and short on authority.

Yet hypocrisy is only part of the problem. Doubling down, plaintiff's counsel makes statements that can only be construed as misleading. In response to defendants' argument that the amended complaint relied upon and explicitly references the 50-h hearing, plaintiff's counsel represents that:

> [Defendants'] sole basis for contending the Amended Complaint was drafted in reliance on the 50-h testimony is to cite ¶32 of the Amended Complaint. However, ¶32 merely pleads compliance with the N.Y. Gen. Mun. L. requirement of service of a Notice of Claim and submission to a 50-h Examination.

DE 30-10 at 5. In making this assertion, however, counsel omits paragraph 216 of the amended complaint, which expressly cites to the 50-h hearing transcript to support substantive allegations of the complaint. Thus, plaintiff's position regarding the use of the 50-h transcript falls somewhere between manipulative and sanctionable.

Once one digs into the substance of the matter, the reasons behind counsel's vehement objection to review of the 50-h hearing transcript become apparent.[3] In its pages, plaintiff's principal provides sworn testimony that belies assertions and allegations made in this matter, and provides additional information that renders many of plaintiff's claims dubious.

Thus, where the 50-h hearing transcript provides information relevant to this matter—or, in certain instances, contradicts the allegations of the amended complaint—it has been considered accordingly. *Equinox Gallery Ltd. v. Dorfman*, 306 F. Supp. 3d 560, 576 (S.D.N.Y. 2018) ("Even on a motion to dismiss, where a document cited in the complaint is inconsistent with the allegations set forth in the complaint, the document, not the allegations, control, and the court need not accept the allegations in the complaint as true.").

---

[3] The situation is reminiscent of the film *Liar Liar*, in which Jim Carrey plays Fletcher Reede, a litigator compelled via a child's birthday wish to speak nothing but the unvarnished truth for 24-hours, which leads to the following colloquy:

Reede:   Your Honor, I object!
Judge:   And why is that, Mr. Reede?
Reede:   Because it's devastating to my case!

**Factual Background**

Based on the foregoing, the relevant allegations of the amended complaint and the relevant sworn assertions contained in the 50-h transcript include the following:

Plaintiff is a New York limited liability company founded and managed by David DeRosa. DE 14 ¶¶ 12, 13.  Plaintiff purchased the property located at 31 Fort Hill Drive in Lloyd Harbor, New York, as a commercial investment property in January 2019 for $5 million.  *Id.* ¶ 35; Tr. 51. The intent behind the purchase was to generate revenue from the property by engaging in television and film "production work" at the site, with the possible added opportunity of "flipping it" at some point.  Tr. 53-54.  While the amended complaint alleges that "a group of investors primarily from India and of South Asian/Indian descent have a financial interest in the property," DE 14 ¶ 14, the 50-h transcript establishes that none of the members of plaintiff, an LLC, are racial or religious minorities.  *See* Tr. 43-46.  Moreover, though the complaint identifies Rakesh Bhargava's "investment fund" as a "major investor" in the property, DE 14 ¶ 87, he is not a member of the plaintiff LLC, Tr. 96, does not appear on the deed, and the nature of that investment remains unidentified.  Furthermore, while the amended complaint implicitly alleges that the property had, historically, not been used as a residential property, *see* DE 14 ¶¶ 37-40, this allegation is contradicted by the sworn testimony before the Court: in addition to any other events they may have hosted, the prior owners had used the property primarily as a family residence.  *See* Tr. 52.[4]

The amended complaint posits that problems arose from a silent religious retreat organized by Bhargava and the World Spiritual Awareness Forum, Inc., a religious not-for-profit corporation, that occurred on the property on Memorial Day weekend of 2019.  DE 14 ¶¶ 60, 85, 87.  Allegedly,

---

[4] Most if not all of the inaccuracies identified in the 50-h hearing were contained in the original complaint in this matter.  That counsel failed to correct these matters proves telling because the express purpose of filing the first amended complaint was to update that document to reflect that the 50-h examination had been conducted.  DE 15 at 1.

approximately twenty-five individuals of South Asian descent, including Bhargava, attended the retreat. *Id.* ¶¶ 61, 97. Unidentified neighbors made complaints to the Village regarding the event and a member of the Road Association complained about "dark-skinned people in all white robes" on the property. *Id.* ¶¶ 62-63, 187. The amended complaint further alleges that, on June 18, 2019, Chief Krumpter advised plaintiff's property manager about those complaints, and stated that "with all the terrorist activity happening in the world, can you blame them?" *Id.* ¶¶ 63, 95-96.[5]

The amended complaint then attempts to attribute—often conclusorily—subsequent occurrences to animus arising from the retreat. For example, it is alleged that on May 30, 2019, the Lloyd Harbor Police Department sent a fax to plaintiff with a copy of Local Law 1-2019, codified at § 205-10 of the Village's Zoning Code, which prohibited the use of a property in a manner that "[t]ends to disturb or annoy the residents of the Village" or "[i]s obnoxious or offensive to the surrounding community by reason of causing or emitting unreasonable levels of . . . noise." *Id.* ¶ 89.

*The Charity Event*

Plaintiff had been planning a charity event scheduled for October 2019 to benefit St. Jude Children's Research Hospital and the Central Presbyterian Church (the "Charity Event"). *Id.* ¶¶ 66, 79. Prior to the retreat, Village officials had not raised any issues regarding this event. *Id.* ¶¶ 67, 81, 82. However, on or about June 17, 2019, after the retreat, the Village attorney sent a cease-and-desist letter to plaintiff stating:

> The Village has received complaints and observed your use of the above-referenced premises and advertisement thereof for commercial purposes. Please be advised

---

[5] The amended complaint attributes disturbing (albeit out-of-context) comments and improper acts to Chief Krumpter. As required by the procedural rules, the Court must assume these allegations to be true. This legally-required assumption should not be seen as an attack on his character; Chief Krumpter has testified in other cases before judges in this Court and has been found credible. *See, e.g.*, *Luca v. Cnty. of Nassau*, No. 04-CV-4898 (FB), 2008 WL 2435569, at *5 (E.D.N.Y. June 16, 2008), *vacated in part on other grounds,* 344 F. App'x 637 (2d Cir. 2009 ("The Court credits Krumpter's testimony.")

> that this use violates the Village's Zoning Code.  Please be advised that the
> Village's Zoning Code permits residential use only and to the extent you have
> scheduled events that are commercial in nature, these events are illegal and the
> police will respond should these events proceed.  You must cease and desist this
> commercial use and advertisement thereof within five (5) days of the date of this
> letter in order to prevent further action by the Village.

*Id.* ¶ 90.  Around this time, a Village Board of Trustees meeting included a discussion of plaintiff's

alleged commercial use of its residential-zoned property.  *Id.* ¶¶ 93-94.

On August 14, 2019, plaintiff's representative and attorney met with Mayor Thatcher, two

Village Trustees and the Village attorney about the Charity Event.  *Id.* ¶ 105.  During the meeting,

a Village official allegedly commented that there should be no more "people in white robes" at the

property.  *Id.* ¶ 107.  Following the meeting, plaintiff submitted additional information to the

Village concerning the Charity Event, including plans showing adequate event parking on the

property.  *Id*. ¶ 109.  On September 9, 2019, Clerk Cervini advised plaintiff's attorney that the

Village would not allow the Charity Event to take place on the property.  *Id.* ¶ 111.

On September 16, 2019, plaintiff filed a complaint in New York State Supreme Court,

Suffolk County, against the Village seeking to enjoin it from interfering with the Charity Event.

*Id.* ¶ 117.  In accordance with a so-ordered stipulation from the state court, the Charity Event took

place, as planned, on October 6, 2019.  *Id.* ¶¶ 119–20.

*The Alleged Search Activity*

According to the complaint, beginning the day after the retreat, the Village police began

regularly patrolling the property, entering and driving on the property without a warrant and

without permission, and at the direction of Chief Krumpter.  *Id.* ¶¶ 113, 136–40.  Plaintiff suggests

that this search activity was conducted pursuant to Village Code § 205-7, which then provided

that: "the police in discharge of their duties shall have the authority to enter any building or

premises at any reasonable hour, in accordance with law."  *Id.* ¶ 112.  The Village Police have

been at the property at least 100 times and plaintiff has never received a single ticket or violation notice of any kind. *Id.* ¶ 140.

Additionally, Building Inspector Sino allegedly entered buildings on the property without permission or a warrant. *Id.* ¶ 114. On September 20, 2019, Building Inspector Sino called plaintiff's agent from inside the main dwelling of the property and claimed that he was investigating neighbor complaints about unauthorized work at the property, though the complaint acknowledges that painting and wallpapering contractors were working on the property at that time. *Id.* ¶ 115. On December 20, 2019, DeRosa hosted a Christmas party on the property for approximately 30-40 guests. *Id.* ¶ 130. During the party, the Village Police entered the private road surrounding the property, and Inspector Sino entered the main dwelling without permission or a warrant stating that he was there to investigate claims of erratic driving. *Id.* ¶¶ 132–34.

On March 20, 2021, DeRosa hosted a small, televised religious pre-Easter gathering on the property. *Id.* ¶ 128. Shortly thereafter, on April 8, 2021, the Village's attorneys issued a second cease-and-desist letter to plaintiff. *Id.* ¶¶ 127–28, 166.[6] Plaintiff's attorney demanded that the Village withdraw the second cease-and-desist letter claiming that it was a violation of the state court's so-ordered stipulation. *Id.* ¶ 170. The Village refused. *Id.* ¶ 171.

*The Challenged Laws*

Many months after the retreat, in 2020, the Village enacted two ordinances—really at the core of this action—regulating the issuance of commercial filming permits and referred to in the amended complaint as Local Law 1 and Local Law 2. *Id.* ¶ 141. Though the amended complaint

---

[6] In several other instances, the amended complaint alleges that the Village "complained" about certain occurrences, without specifying the form of such complaints. *See, e.g.*, ¶ 172 (noting the Village "complained about a wedding at the property").

purports to provide a laundry list of "blatant defects" of these enactments, only selective snippets of the provisions appear in the complaint, and the full text is not provided. *Id.* ¶¶ 143–65.

In April 2021, plaintiff was notified that Next Step Productions, which produces films for Showtime, was interested in shooting television scenes at the property. *Id.* ¶ 175. Production agents informed plaintiff that they had already worked out the filming details directly with the Village Police and with the Village Clerk. *Id.* ¶ 178. On June 8, 2021, production agents met with plaintiff's staff at the property to prepare the permit application; a neighbor called the police to report the presence of the production team's vehicles. *Id.* ¶¶ 179–80. According to the allegations, Chief Krumpter informed plaintiff's staff that the Village supported filming due to the revenue generated by permit fees and indicated that the Police Department would be able to work with production agents. *Id.* ¶¶ 182–83. The Village Clerk requested that the production team limit the use of the roads in connection with the anticipated shoot and the production team agreed that all large trucks would be parked off-site and that the crew and supplies would be taken to the property via smaller vehicles. *Id.* ¶ 184.

On June 9, 2021, plaintiff's counsel sent a letter to the Village attorney demonstrating compliance with all permit requirements set forth in Chapter 151 of the Village Code. *Id.* ¶¶ 190–91. On June 11, 2021, the Village attorney responded that the permit application submitted by Next Step was "incomplete for a number of reasons, including but not limited to failure by Next Step Productions, LLC to obtain written approval from the road association allowing access over the private road." *Id.* ¶¶ 192–93. On June 14, 2021, Next Step submitted an amended application to the Village Clerk and notified neighbors of the impending film shoot to which no objections were made. *Id.* ¶¶ 195, 202. That same day, Shapses informed Next Step that the Road Association

would not allow any filming at the property. *Id.* ¶¶ 196, 199.  Filming was due to begin on June 21, 2021 but never took place. *Id.* ¶ 205.

Around September 2021, Happy Place, a film studio, sought to conduct filming at the property and was directed by Village officials that no filming would be allowed unless the Road Association approved the film crew's travel over Fort Hill Drive. *Id.* ¶ 208.  On September 25, 2021, Shapses informed Happy Place that their request was denied, "falsely claim[ing] that as a result of an early-September rainstorm the road could not be used"—"Fort Hill Beach and Road Association area has been declared a disaster area by FEMA." *Id.* ¶ 210–14.

According to plaintiff, defendants repeatedly blocked its approval requests for additional filming events. *Id.* ¶ 216.  The Village and Clerk Cervini "have refused to grant or consider issuing [filming permit requests] without Road Association approval, which the Road Association has deliberately and intentionally failed to give" resulting in lost "income and revenues of over a million dollars." *Id.* ¶¶ 219–20.

Based on these allegations, the amended complaint purports to set forth the following causes of action: (1) a multiplicitous claim under 42 U.S.C. § 1983, predicated upon, astonishingly, *nine* constitutional theories, including three equal protection theories, three First Amendment claims, Due Process, Fourth Amendment and Fifth Amendment takings contentions; (2) retaliation for the exercise of constitutional rights emanating from the state court litigation; (3) a *Monell* theory against the Village; (4) a § 1983 conspiracy to violate civil rights; (5) claims of intentional racial discrimination under 42 U.S.C. §§ 1981 and 1983; (6) conspiracy to effect racial and invidious discrimination in violation of 42 U.S.C. § 1985; (7) a state law constitutional claim mirroring the first cause of action; (8) declaratory judgment against the Village defendants attacking the constitutionality of Local Laws 1 and 2; (9) declaratory judgment against the Road

Association defendants for interference with property rights; (10) discrimination in connection with the New York State Executive Laws; (11) regulatory taking under the New York Eminent Domain Procedure Law[7]; and (12) tortious interference with economic relations under state law. Plaintiff demands a jury trial, in excess of $10 million in compensatory damages, punitive damages, declaratory relief, preliminary and permanent injunctive relief and attorneys' fees and costs.

**Discussion**

*Standard of Review*

Motions to dismiss are decided under the well-established standard of review for such matters, as discussed in *Burris v. Nassau County District Attorney*, No. 14-5540, 2017 WL 9485714, at *3-4 (E.D.N.Y. Jan. 12, 2017), *adopted by* 2017 WL 1187709 (E.D.N.Y. Mar. 29, 2017), and incorporated by reference herein.  The gravamen of that standard, of course, is whether, assuming the allegations in the complaint to be true, solely for the purposes of the motion, the complaint sets forth sufficient factual allegations to render the claims plausible.  *See id.*

*Claims of Racial or Religious Discrimination by the Plaintiff LLC*

Many of the claims asserted by plaintiff, a legal entity, emanate from allegations of discrimination based on racial, religious and/or national origin.  Defendants challenge plaintiff's standing to bring such claims and assert that the allegations are too conclusory to withstand review under Rule 12.

To state a claim under Section 1981, for example, a plaintiff must allege sufficient facts to demonstrate "(1) the plaintiff is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) the discrimination concerned one or more of the activities

---

[7] In its opposition papers, plaintiff withdrew its takings claim under New York Eminent Domain Procedure Law. *See* DE 31-3 at 22.

enumerated in the statute." *Mian v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 7 F.3d 1085, 1087 (2d Cir. 1993) (per curiam); *Reyes v. Fairfield Props.*, 661 F. Supp. 2d 249, 267 (E.D.N.Y. 2009). The scope and availability of Section 1981 has been interpreted broadly to include non-minority plaintiffs alleging personal injury "stemming from a defendant's discriminatory conduct against a racial minority." *Center for Transitional Living, LLC v. Advanced Behav. Health, Inc.*, No. 20 CV 9815 (KAD), 2021 WL 3409512, at *7 (D. Conn. Aug. 4, 2021)  ("A plaintiff does not have to be a member of a racial minority to bring a claim under Section 1981.") (*purgandum*).  In a section 1983 action, a plaintiff can proceed on a selective enforcement theory under the Equal Protection clause based upon his or her membership in a particular class, compared with others similarly situated.  *LaTrieste Rest. & Cabaret Inc. v. Village of Port Chester*, 40 F.3d 587, 590 (2d Cir. 1994).

Thus, to properly plead, and ultimately prove, actionable discrimination under 42 U.S.C. §§ 1981 or 1983 and related causes of action, a plaintiff must establish that it is member of a protected class.  While business entities would generally lack standing under this analysis, courts have relaxed this requisite for corporations and other business entities under appropriate circumstances. *See, e.g.*, *Costello v. Town of Huntington*, No. 14-CV-2061 (JS)(GRB) 2015 WL 1396448, at *12 (E.D.N.Y. Mar. 25, 2015) ("The first element has been modified so that a plaintiff need not be a member of a racial minority so long as the plaintiff has alleged an injury [derivative] of defendant's discriminatory actions against a racial minority.").  This generally occurs in one of two ways.  First, a legal entity affected by alleged discrimination where its membership reflects a connection to a racial, national or religious minority.  As Judge Liman recently noted:

> To determine whether a corporation was subjected to discrimination based on its imputed racial identity, courts have looked to the ownership of the corporation and the identity of its shareholders, directors, officers and employees.  Where a corporation is discriminated against because of the race of those constituents, the

corporation has a cognizable claim under Title VI. *See Hudson Valley*, 671 F.2d at 706 (endorsing "[t]he principle that a corporation may assert equal protection claims when it alleges discrimination because of the color of its stockholders").

*Bibliotechnical Athenaeum v. American Univ. of Beirut*, 527 F. Supp. 3d 625, 633 (S.D.N.Y. 2021), *aff'd,* 2022 WL 710896 (2d Cir. 2022). While the amended complaint attempts to create such standing by invoking Bhargava's alleged connection to the property, this effort proves unavailing: as the 50-h hearing plainly establishes, he is neither an owner of the property nor a member of the plaintiff LLC. There is nothing alleged, or otherwise asserted, about the ownership of the plaintiff LLC that would justify imputed standing on this basis.

Second, a legal entity may derive standing to pursue discrimination claims where its primary functions are affected by, and could provide the bases for, alleged discriminatory conduct. For example, in *Bibliotechnical Athenaeum*, Judge Liman considered claims by a company whose "primary purpose is to fight against anti-Israeli discrimination," and was alleging bias on the basis of national origin. 527 F. Supp. 3d at 630. In *Hudson Valley Freedom Theater, Inc. v. Heimbach,* Judge Friendly found imputed racial standing for an entity established "to produce theatrical and artistic productions in Orange County and the Mid-Hudson area which particularly reach and involve the Black and Hispanic communities reflecting the cultural needs, aspirations and creativity of the Black and Hispanic communities of the Mid-Hudson area." 671 F.2d 702, 703 (2d Cir. 1982) (*purgandum*).

While the amended complaint attempts to draw on this concept by citing the LLC's purported interest in hosting charitable and religious functions as a basis to proceed with its proffered discrimination claims, as can be discerned from the amended complaint, and confirmed by the 50-h hearing, these activities are ancillary to the plaintiff's principal purpose: to generate revenue by leasing the property for film production. *See* Tr. 53-54 (testimony concerning income generation through film production and "flipping" property); Tr. 86, 88 (plaintiff received neither

compensation nor tax benefits from hosting three Christian retreats); *id.* 95-96 (no financial benefit from the World Spiritual retreat); DE 14 ¶ 220 ("Because of the lost filming, Plaintiff has lost enormous income and revenues of over a million dollars"); *id.* ¶ 228 (describing "Plaintiff's investment-backed expectations when it purchased the Property that it would be able to finance the purchase and its upkeep [through] commercial and non-commercial events and for filming); *id.* ¶ 232 ("Plaintiff is substantially "cash insolvent" without the aid of commercial filming and events revenues, thus threatening its continued viability").   Therefore, plaintiff has failed to adequately allege standing to pursue claims of discriminatory animus.

Even assuming, *arguendo*, that plaintiff could properly allege standing, two other factors require dismissal of the discrimination claims.   First, plaintiff entirely fails to allege a plausible connection between its hosting of a small spiritual retreat in early 2019 and the Village's revamping of its commercial filming permit regulations nearly a year later.    In fact, the amended complaint alleges that, in the intervening period, Chief Krumpter expressed the Village's support for filming projects, as the permit revenue would benefit the Village, and describes how other Village defendants facilitated one of the commercial film shoots at the property.  *Id.* ¶ 183; *cf. id.* ¶ 178 (Village Clerk had worked out details with network for filming project); *id.* ¶ 182 (Krumpter arranges police and fire department assistance for film shoot).   Ultimately, though, the amended complaint alleges that the refusal of the Road Association defendants to consent to the use of its privately-owned roadways doomed the project.  *Id.* ¶ 186.   Thus, the only means by which plaintiff can press these claims further is to allege a civil rights conspiracy that encompasses the Village defendants and the Road Association defendants.

However, plaintiff's efforts to allege a civil rights conspiracy utterly fails.  "Claims alleging conspiracies to violate civil rights are held to a heightened pleading standard."  *Brewster v. Nassau*

*Cnty.*, 349 F. Supp. 2d 540, 547 (E.D.N.Y. 2004) (*purgandum*).   It is well settled that "[a] complaint containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss." *Sommer v. Dixon*, 709 F.2d 173, 175 (2d Cir. 1983).  As is relevant here, in order to survive a motion to dismiss, section 1983 and 1985 conspiracy claims "must provide some factual basis supporting a meeting of the minds, such as that defendants entered into an agreement, express or tacit, to achieve the unlawful end, augmented by some details of time and place and the alleged effects of the conspiracy." *K.D. ex rel. Duncan v. White Plains Sch. Dist.*, 921 F. Supp. 2d 197, 208 (S.D.N.Y. 2013) (*purgandum*). "Without a meeting of the minds, the independent acts of two or more wrongdoers do not amount to a conspiracy." *Fisk v. Letterman*, 401 F. Supp. 2d 362, 376 (S.D.N.Y. 2005) (*purgandum*).

The amended complaint is devoid of any such allegations.  Plaintiff has failed to provide any factual basis supporting an agreement or meeting of the minds between the Road Association defendants and the Village defendants.  Rather, plaintiff makes conclusory allegations that the Road Association defendants "actively conspired" with the Village defendants "since 2019 to discriminate and retaliate against and deprive Plaintiff of its right to use the Property as it has been used for decades, out of racial and religious animosity . . . ." *See* DE 14 ¶ 186.  Such general and vague allegations fail to demonstrate the requisite meeting of the minds or meet the heightened pleading standard for civil rights conspiracy claims.  *See Artemov v. Ramos*, No. 18-CV-2537 (PKC)(LB), 2018 WL 2121595, at *2 (E.D.N.Y. May 8, 2018); *Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) (affirming dismissal of conspiracy claim where plaintiff "offer[ed] not a single fact to corroborate her allegation of a 'meeting of the minds' among the conspirators"); *Webb v. Goord*, 340 F.3d 105, 110–11 (2d Cir. 2003) (to maintain a conspiracy action, plaintiff "must provide some factual basis supporting a meeting of the minds").

Therefore, plaintiff's claims rooted in purported discriminatory animus must be dismissed.

*Fourth Amendment Claim*

Plaintiff asserts claims under the Fourth Amendment based upon the alleged illegal search activities described above.  The Village defendants oppose plaintiff's Fourth Amendment claim solely based upon failure to allege an injury.  DE 31-1 at 15.  However, a plaintiff who has proven a civil rights violation but has not proven actual compensable injury may be entitled to an award of nominal damages.  *Amato v. City of Saratoga Springs, New York*, 170 F.3d 311, 317 (2d Cir. 1999) ("While the main purpose of a § 1983 damages award is to compensate individuals for injuries caused by the deprivation of constitutional rights, a litigant is entitled to an award of nominal damages upon proof of a violation of a substantive constitutional right even in the absence of actual compensable injury.").  And, of course, even where compensatory damages are limited to a nominal award, the question of punitive damages may remain.  *See Aponte v. Perez*, 75 F.4th 49, 55-56 (2d Cir. 2023).  At the same time, the parties should be mindful of the fact that "a nominal damage award can be grounds for denying or reducing an attorney's fee award."  *Amato*, 170 F.3d at 317.

Accordingly, Village defendants' motion to dismiss plaintiff's claims emanating from the Fourth Amendment is denied.

*Takings Claim*

The amended complaint alleges that "the Village has taken Plaintiff's property without just compensation" in violation of the Fifth Amendment.  DE 14 ¶ 273.  "Under the Takings Clause, the government must compensate a landowner" when government action "effects a 'permanent physical occupation' of his property, or if a regulatory action forces him to 'sacrifice all economically beneficial uses in the name of the common good.'"  *Vanderveer v. Zoning Bd. of*

*Appeals*, No. 2:19-CV-3833 (FB)(CLP), 2020 WL 7042669, at *2 (E.D.N.Y. Dec. 1, 2020) (quoting *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1019 (1992)), *aff'd sub nom*. *Vanderveer v. Zoning Bd. of Appeals Town of E. Hampton*, No. 20-4252, 2021 WL 3745741 (2d Cir. Aug. 25, 2021)).  In rare cases, government action that merely "impede[s] the use of property without depriving the owner of all beneficial use" may constitute a regulatory taking "based on a complex of factors" enunciated in *Penn Central Transp. Co. v. City of New York*, "including [1] the regulation's economic effect on the landowner; [2] the extent to which the regulation interferes with reasonable investment-backed expectations; and [3] the character of the government action." *Murr v. Wisconsin*, 582 U.S. 383, 393 (2017) (citing *Penn Cent. Transp. Co.*, 438 U.S. 104, 124 (1978)).

Here, the parties agree that the *Penn Central* test applies as the amended complaint does not allege that the Village has forced plaintiff to "sacrifice all economically beneficial uses" of its property.  *See* DE 31-3 at 17-19; DE 31-4 at 9-10.  Analysis under that test suggests that plaintiff has failed to articulate a plausible claim.

The first factor—the "economic effect" on plaintiff—does not weigh in favor of finding a taking.  Plaintiff alleges that it is "being blocked and impeded" from using the property for film projects, thereby "threaten[ing] the continued viability and Plaintiff's ability to carry the costs of the subject property."  DE 14 ¶¶ 230–31.  "[I]t is clear, however, that prohibition of the most profitable or beneficial use of a property will not necessitate a finding that a taking has occurred." *Sadowsky v. City of New York*, 732 F.2d 312, 317 (2d Cir. 1984) (citing *Andrus v. Allard*, 444 U.S. 51, 66 (1979) (affirming district court's determination that a local zoning law did not effect a taking of plaintiffs' land despite the fact that the law permanently prohibited the commercial use for which plaintiffs had purchased the property)); *Vanderveer*, 2020 WL 7042669, at *3 (noting a

Town's refusal to allow commercial use of plaintiff's property carries some economic impact but does not constitute a taking because the plaintiff could still construct a residence on the property). Similarly, here, the Plaintiff's claim that it can no longer use the property for commercial filming fails to plausibly allege an economic impact that rises to the level of a taking.

With respect to the second *Penn Central* factor, plaintiff alleges that it held "investment-backed expectations" that commercial filming would finance the purchase and upkeep of the property. DE 14 ¶ 228. The second *Penn Central* factor examines the extent to which the regulatory action "has upset [plaintiff's] investment-backed economic expectations by altering its rights as to a constitutionally protected property interest." *1256 Hertel Ave. Assocs., LLC v. Calloway*, 761 F.3d 252, 266 (2d Cir. 2014). "The purpose of the investment-backed expectation requirement is to limit recovery to owners who could demonstrate that they bought their property in reliance on a state of affairs that did not include the challenged regulatory regime." *Allen v. Cuomo*, 100 F.3d 253, 262 (2d Cir. 1996) (*purgandum*). "To have a property interest in a benefit, a [plaintiff] clearly must have more than an abstract need or desire and more than a unilateral expectation of it. [It] must, instead, have a legitimate claim of entitlement to it." *South Nassau Build. Corp. v. Town Bd. of Town of Hempstead*, 624 F. Supp. 3d 261, 277 (E.D.N.Y. 2022) (quoting *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005)). Plaintiff falsely alleges that the property was not residential in nature and fails to articulate expectations that arise to the level of a property interests. Accordingly, this factor does not weigh in plaintiff's favor.

The final factor— the "character of [the Village's] action"—also supports a finding that no taking occurred. In *Penn Central*, the Supreme Court explained that a taking "may more readily be found when the interference with property can be characterized as a physical invasion . . . than when interference arises from some public program adjusting the benefits and burdens of economic

life to promote the common-good."  438 U.S. at 124; *see e.g., Vanderveer,* 2020 WL 7042669, at *3 (finding that a zoning law which eliminates nonconforming uses is a public program to promote the common-good); *see also Matter of 550 Halstead Corp.*, 1 N.Y.3d 561, 561 (N.Y. 2003) ("Because nonconforming uses are viewed as detrimental to zoning schemes, public policy favors their reasonable restriction and eventual elimination").  While the parties have submitted some material as to the purported purpose of the enactments, *see* DE 14 ¶ 201 (*quoting* Shapses Affidavit filed in the state court action), these materials are not properly before the Court.  However, the "character" of the regulation as described in the amended complaint is not that of a "physical invasion," but rather a traditional zoning regulation, thus the plaintiff failed to plausibly allege that a  regulatory taking occurred.

Having considered the relevant *Penn Central* factors, the Court concludes that plaintiff fails to allege a plausible takings claim, and therefore the Court grants the Village defendants' motion in this respect.

*Declaratory Judgment Claims*

The amended complaint purports to assert separate claims against the Village defendants and the Road Association defendants for a permanent injunction and declaratory relief.  DE 14 ¶¶ 260–68.  However, injunctive and declaratory relief are remedies, not separate causes of action. *Cangemi v. United States*, 939 F. Supp. 2d 188, 196 (E.D.N.Y. 2013) (citing *In re Joint E. & S. Dist. Asbestos Litig.*, 14 F.3d 726, 731 (2d Cir. 1993) ("[A] request for relief in the form of a declaratory judgment does not by itself establish a case or controversy involving an adjudication of rights.")).  Rather, a plaintiff "must properly plead an underlying cause of action in order to seek such relief."  *Id.*  Accordingly, defendants' motions to dismiss these separate claims are granted.

*Remaining Claims*

The above determinations concerning plaintiff's Fourth Amendment claim, and its improper assertion of claims emanating from discriminatory animus, declaratory judgment claims and claims under the Takings Clause, would appear to resolve the lion's share of the action. However, to the extent certain claims may remain unresolved, they appear hopelessly entangled with those matters subject to dismissal.  Indeed, the amended complaint constitutes an "everything but the kitchen sink"-style pleading, a trackless forest of allegations reflecting an effort to "throw everything against the wall and see what sticks."

Though defendants failed to raise the question, the balance of the 56-page, 279-pargraph amended complaint runs afoul of the ameliorative proscriptions of Rule 8 of the Federal Rules of Civil Procedure, which requires "a short and plain statement of the claim[s] showing that the [plaintiff is] entitled to relief" and that "[e]ach allegation [ ] be simple, concise, and direct."  As this Court has held:

> That Rule permits, and at times requires, the dismissal of a complaint where its length and complexity obscures its function as a notice pleading. *See, e.g.*, *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988) (discussing the Court's authority to "dismiss a prolix complaint without leave to amend in extraordinary circumstances, such as where leave to amend has previously been given and the successive pleadings remain prolix and unintelligible"). "When a complaint fails to comply with these requirements, the district court has the power, on motion or *sua sponte*, to dismiss the complaint or to strike such parts as are redundant or immaterial." *Simmons v. Abruzzo*, 49 F.3d 83, 86 (2d Cir. 1995) (noting that such dismissal is generally reserved to situations in which a "complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised"). Those authorities generally deal with *pro se* pleadings which are accorded wide latitude, yet the complaint in this case, prepared by counsel, appears to fit the description.

*Snyder v. County. of Nassau*, 531 F. Supp. 3d 609, 618 (E.D.N.Y. 2021).  Similarly, here, the allegations are necessarily tangled with the legally insufficient allegations such that the Court is unable to make determinations concerning, for example, whether the Fourth Amendment claim is

sufficiently related to the purported state law claims that the exercise of pendent jurisdiction would be appropriate.  Thus, the Court hereby grants dismissal, without prejudice, as to all remaining matters in the complaint other than the Fourth Amendment claim.

This, in turn, requires some comment about leave to replead.  While the Court will grant leave to replead should plaintiff wish to continue with this action, counsel should carefully consider all of the matters discussed herein prior to submitting any amended pleading, as the Court will not hesitate to consider sanctions in the face of similar conduct in the future.

**Conclusion**

For the reasons and to the extent stated herein, defendants' motion is granted in part, and denied in part.  Should plaintiff wish to continue with this action, plaintiff is directed to serve and file a second amended complaint within twenty days from the date of this Order.  The granting of leave should not be viewed as aspirational, however, and counsel should conduct a detailed review of this opinion, and the case, in connection with any amendment.

**SO ORDERED.**

Dated: Central Islip, New York
        September 29, 2023

/s/ Gary R. Brown
GARY R. BROWN
United States District Judge